**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | |
|---|---|
| ADVANCE STORES COMPANY, INCORPORATED, a Virginia corporation, )<br>)<br>) | |
| Plaintiff, ) | |
| v. ) | Case No.  **7:17CV568** |
| FRONTSTREET FACILITY SOLUTIONS, INC., a Delaware corporation, )<br>) | |
| Defendant. ) | |

## COMPLAINT

COMES NOW Advance Stores Company, Incorporated ("Plaintiff" or "Advance"), by counsel, and files the following for its Complaint against FrontStreet Facility Solutions, Inc. ("Defendant" or "FrontStreet"). In support of its Complaint, Advance states as follows:

### Nature of the Action

1.      Advance seeks damages from FrontStreet as a result of FrontStreet's several breaches of a Facilities Master Services Agreement arising out of the removal and replacement of flooring at an Advance retail store in Fenton, Missouri.

2.      Advance owns and operates a retail store located in Missouri within St. Louis County at 95 Fenton Plaza, Fenton, Missouri 63026, which store Advance internally identifies as Store No. 105817 ("Fenton Store").

3.      FrontStreet was contracted to remove certain floor tiles, thereby exposing the concrete floor, which was then to be ground to a consistent level and finish and sealed.

4.      FrontStreet undertook the work, but did so improperly, which is a breach of its agreement with Advance.

5.      FrontStreet failed to comply with local, state, and federal laws related to the determination of asbestos containing materials ("ACM"), which  failures are a breach of its agreement with Advance.

6.      FrontStreet removed the flooring, thereby releasing ACM, which is a breach of its agreement with Advance.

7.      As a result of FrontStreet's multiple breaches of its agreement with Advance, FrontStreet has caused Advance to incur significant amounts of financial damages totaling at least $1,243,501.57.

**Parties**

8.      Advance is a corporation that is organized and operating under the laws of the Commonwealth of Virginia. Advance's principal place of business is located at 5008 Airport Road, Roanoke, Virginia 24012.

9.      Upon information and belief, FrontStreet is a corporation that is organized and operating under the laws of the State of Delaware. FrontStreet's principal place of business is located at 4701 Veterans Memorial Highway, Bohemia, New York 11716.

**Jurisdiction and Venue**

10.     This Court has subject matter jurisdiction as to this matter because the Plaintiff and Defendant are corporations that are incorporated and maintain principal places of business in different states. *See* 28 U.S.C.S. § 1332.

2

11.     This Court has subject matter jurisdiction as to this matter because the Plaintiff seeks damages that exceed $75,000.00, exclusive of interest, costs, and attorney's fees. *See* 28 U.S.C.S. § 1332.

12.     This Court has personal jurisdiction over FrontStreet because FrontStreet entered into a Facilities Master Services FMSA ("Agreement") with Advance, effective April 17, 2013. The Agreement contains a provision under which FrontStreet consented to jurisdiction in this Court for resolution of any disputes between these parties.  Further, FrontStreet entered into the Agreement and related work order in Virginia, through its negotiations and subsequent entering into the Agreement and related work order with Advance. A copy of the Agreement is attached hereto as **Exhibit 1** and is incorporated by reference as if set forth in full herein.

13.     Venue is proper in this judicial district because the Plaintiff and Defendant "irrevocably consent[ed] to the jurisdiction of the federal and state courts situated in the City of Roanoke, Virginia and agreed that any lawsuit arising out of or related to this agreement shall be brought only in such courts." *See* Exh. 1, § 14.1; *see also*  28 U.S.C. §§ 1391(a), (b) and (c).

### Background

A.      **The Facilities Master Services Agreement.**

14.     Advance and FrontStreet entered into the Agreement, which was effective as of April 17, 2013.

15.     Pursuant to the Agreement, FrontStreet had a standing agreement to perform "Lighting and Electrical, Building Maintenance, Plumbing, Door and Glass" work for, and as needed by, Advance. *See* Exh. 1, pg. 1.

25661/1/8255551v1

16.     The initial term of the Agreement was 12 months. *See* Exh. 1, Art. 1. Thereafter, the Agreement was extended on a month-to-month basis. *See Id*. The Agreement remained in full force and was in force at all times relevant to the claims at issue in this Complaint.

17.     Pursuant to the Agreement, FrontStreet was to perform work on individual projects for Advance as requested in subsequent Work Orders. *See* Exh. 1, Art. 2, and Exh. A. Each statement of work was expressly subject to the terms and provisions of the Agreement. *See Id*.

18.     As part of the Agreement, Advance and FrontStreet agreed that FrontStreet would accept full responsibility for identifying and complying with laws and regulations that applied or could apply to projects that FrontStreet undertook under the Agreement. *See* Exh. 1, §§ 9.1, 10.1(b).

19.     Specifically, FrontStreet, for itself and its "Representatives"[1], agreed to "*full and total responsibility* for compliance with all federal, state and local laws, ordinances, regulations or permits applicable to the Services" that FrontStreet undertook for Advance, including all "pertinent environmental laws and regulations." *See* Exh. 1, § 9.1 (emphasis added).

20.     If FrontStreet, or its representatives, failed to comply with any of the laws and regulations, "any penalties, fines, damages, claims or expenses of any kind incurred in connection therewith" would be paid by FrontStreet. *See* Exh. 1, § 9.1.

21.     Furthermore, FrontStreet warranted and represented to Advance, with the express purpose that Advance would rely upon such warranty and representations in entering into the Agreement, that "[FrontStreet] and its Representatives *shall perform* the Services in accordance

---

[1] The term "Representatives" is defined in the Agreement to collectively refer to "[FrontStreet's] representatives, subcontractors, agents, employees, or contractors[.]" *See* Exh. 1, § 6.1.

with, *and shall not violate any applicable laws or regulations of any applicable jurisdiction*[.]"

*See* Exh. 1, § 10.1(b) (emphases added).

22.    Pursuant to the Agreement, FrontStreet agreed to:

> indemnify and hold Advance [ . . . ] harmless from any loss, claim, damage, liability or expense, of any nature or kind (including attorneys' fees) directly or indirectly arising out of, related to or resulting from this Agreement [ . . . ] including, without limitation any of the following: (i) *any breach* or default of any *of the terms, conditions, warranties, representations or obligations of Contractor contained herein*; (ii) *any damage or injury of any kind*, whether to person or property (including death), resulting from or arising out of the performance or non-performance of the Services by Contractor or its Representatives, its agents or employees[.]

*See* Exh. 1, § 9.2 (emphases added).

23.    Pursuant to the Agreement, FrontStreet agreed to provide and maintain insurance:

> Contractor, at its own expense[,] shall provide and maintain insurance as follows during the Term of this Agreement from insurance carrier(s) licensed and admitted to do business in the state(s) in which services are rendered and which have an AM Best financial rating of A- or higher: [ . . . ] [f]or vendors involved in the handling or transportation of hazardous waste, environmental liability and pollution clean-up coverage in the amount of $1,000,000. The policy shall [sic] Advance as an additional insured party and also shall be endorsed to include a waiver of subrogation in favor of Advance.

*See* Exh. 1, § 9.5(e).

24.    Pursuant to the Agreement, FrontStreet agreed to:

> ensure that all subcontractors and other Representatives performing work at Advance Locations maintain insurance with coverages and amounts equal to or better than the coverages and amounts set forth in [the] Agreement.

*See* Exh. 1, § 9.6.

25.    Pursuant to the Agreement, FrontStreet was permitted to subcontract with a

Representative to perform work under the Agreement, but only if the subcontractor was a

"highly skilled professional with a good reputation" and only if the subcontractor "is held to the same performance standards" as FrontStreet. *See* Exh. 1, § 21.1(c).

26.     Pursuant to the Agreement, if FrontStreet hired a subcontractor, FrontStreet was required to:

> (a) ensure that equivalent contract terms exist between the subcontractor and [FrontStreet] including, but not limited to, contract terms equivalent with the indemnity, insurance and confidentiality sections of [the] Agreement, (b) actively monitor and manage such subcontractors, (c) remain directly responsible and liable in accordance with [the] Agreement for the acts and omissions of such subcontractor, and (d) be responsible for the payment of all subcontractors for work and services provided.

*See* Exh. 1, § 21.1(c).

27.     Pursuant to the Agreement, and for the express purpose that Advance would rely upon such warranty and representations in entering into the Agreement, FrontStreet represented and warranted to Advance that FrontStreet and any Representative:

> shall employ skilled, trained and, if required, licensed personnel for the performance of the Services and shall perform the Services in a good, professional and workmanlike manner, and to standards and requirements in the industry for the Services required or requested[.]

*See* Exh. 1, § 10.1(a).

28.     Pursuant to the Agreement, Advance and FrontStreet knowingly, voluntarily and intentionally waived any right to a trial by jury with respect to litigation based on the Agreement or arising out of, under or in connection with the Agreement. *See* Exh. 1, § 14.3.

29.     Pursuant to the Agreement, if Advance brings an action at law or in equity to enforce or interpret the Agreement, then:

> Advance shall be entitled to recover its reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which Advance may be entitled.

*See* Exh. 1, § 15.1.

30.     Pursuant to the Agreement, FrontStreet agreed that it had carefully read the Agreement prior to signing, that the Agreement had been fully explained to FrontStreet before signing, that FrontStreet had the opportunity to have the Agreement reviewed by attorneys of its choosing, and that FrontStreet fully understood the binding effect of the Agreement. *See* Exh. 1, § 26.1.

**B.     The Fenton Flooring Work.**

31.     In early 2016, Advance decided that it needed to have flooring repaired and/or replaced at the Fenton Store.

32.     Through the use of its online proposal process, Advance sought competitive proposals for this flooring work and how it should be accomplished.

33.     On February 11, 2016, FrontStreet submitted Proposal PRP000306642-2 (the "Proposal"), thereby proposing to undertake and complete certain flooring work for Advance at the Fenton Store.  A copy of the Proposal is attached hereto as **Exhibit 2** and is incorporated by reference as if set forth in full herein.

34.     Among other parts of the Proposal, FrontStreet offered to perform the flooring work for $21,800.

35.     Further within the Proposal, FrontStreet proposed that it would:

　　　-Arrive on site after normal business hours
　　　-Remove and dispose of approx. 5000 [square feet] of tiles
　　　-Prepare floor
　　　-Supply and apply concrete sealer[ . . . ]
　　　-Leave work area neat and orderly upon completion

*See* Exh. 2, Description of Services.

7

36.     FrontStreet also stated in its Proposal that the labor necessary for the work would be "overtime." *See* Exh. 2, Proposal Breakdown.  This confirms that FrontStreet's work would be occurring after normal store hours.

37.     Advance accepted FrontStreet's Proposal on February 22, 2016, thereby creating a Work Order for FrontStreet, which tasked FrontStreet with completing the proposed work (the "Flooring Work").

38.     The Work Order incorporated, and became a part of, the terms and conditions of the Agreement.

39.     On or about March 29, 2016, FrontStreet entered into a Purchase Order with flooring subcontractor River City Flooring, Inc., which is based out of Conway, Arkansas, ("Subcontractor"), whereby Subcontractor would perform the Flooring Work at the Fenton Store as a Representative of FrontStreet.

40.     On or about March 13, 2016, the Subcontractor commenced the Flooring Work.

41.      In the afternoon of March 22, 2016, Advance closed the Fenton Store pursuant to recommendations by the Saint Louis County Department of Public Health stemming from FrontStreet's release of ACM in performing the Flooring Work, and on March 24, 2016, the Saint Louis County Department of Public Health formally notified Advance in writing that the Fenton Store was determined to be a public nuisance with ACM dust potentially spread throughout the structure and that it should not be occupied by any person until the ACM was abated.

**C.     Legal Requirements Applicable to the Flooring Work.**

42.     FrontStreet and its Representatives were obligated to investigate for the presence of asbestos pursuant to Missouri Revised Statute ("MO. REV. STAT.") § 643.245.  Under this

8

provision, because the Flooring Work involved more than 160 square feet of flooring, FrontStreet and its Representatives were required to obtain an asbestos pre-construction inspection *before* beginning work on the Flooring Work.

43.     FrontStreet and its Representatives violated this provision by taking no steps to determine the nature of the tile or mastic before grinding, chipping and releasing ACM into the Fenton Store, and thus failed to comply with the statutory obligations of MO. REV. STAT. § 643.245.

44.     Further, pursuant to 40 CFR 61.145, FrontStreet was required to obtain an asbestos preconstruction inspection before commencing work at the Fenton Store.

45.     FrontStreet failed to comply with the statutory obligations of 40 CFR 61.145.

46.     Pursuant to MO. REV. STAT. § 643.235, prior to performing the Flooring Work, FrontStreet and its Representatives were required to register with the Missouri Department of Natural Resources ("MDNR"), and submit an application for registration as an asbestos contractor and to use only individuals on the Flooring Work that has been certified or trained under Missouri law.

47.     FrontStreet and its Representatives failed to comply with the statutory obligations of MO. REV. STAT. § 643.235.

48.     Pursuant to MO. REV. STAT. § 643.240, FrontStreet and its Representatives were required to submit an application for asbestos abatement to MDNR at least 10 days in advance of performing any work at the Fenton Store that disturbed asbestos.  Along with the application, FrontStreet and its Representatives were also required to submit to MDNR a copy of an asbestos inspection survey which included sample analysis results and quantities of asbestos materials identified as well as a description of the Flooring Work and proof that all employees engaged to

9

work on the Flooring Work were in compliance with Missouri state standards as to asbestos training and certification.

49.     FrontStreet and its Representatives failed to comply with the statutory obligations of MO. REV. STAT. § 643.240.

50.     Pursuant to MO. REV. STAT. § 643.240.1, before beginning the Flooring Work, FrontStreet and its Representatives were required to make reasonable efforts to minimize the spread of friable ACM to uncontaminated areas.

51.     FrontStreet and its Representatives failed to make any efforts to minimize the spread of ACM throughout the Fenton Store, and thus, failed to comply with the statutory obligations of MO. REV. STAT. § 643.240.1.

52.     Furthermore, contractors, such as FrontStreet and its Representatives, working in St. Louis County, Missouri were required to comply with St. Louis County Ordinance 612.530 (the "Asbestos Ordinance"), which establishes requirements for the prevention of the release of ACM during construction projects, such as the Flooring Work at the Fenton Store.

53.     Compliance with the Asbestos Ordinance is mandatory and liability is strict. Any contractor who fails to comply is liable, regardless of whether the contractor knew or should have known that the Flooring Work would involve the disturbance or release of ACM.

54.     Specifically, in performing the Flooring Work, FrontStreet and its Representatives were required under the Asbestos Ordinance to:

   (a)     register with the Missouri Department of Natural Resources before beginning the Flooring Work;

   (b)     provide at least 10 days' written notice to the Director of the Department of Health before beginning the Flooring Work;

10

(c)     ensure that Missouri registered and certified workers were employed at the Fenton Store;

(d)     isolate the work areas from other areas of the Fenton Store;

(e)     install airtight seals over doorways, windows and ventilation system openings;

(f)     maintain air pressure within work areas;

(g)     shut down and lock out heating and ventilation systems during the work;

(h)     post appropriate warning signs at all entryways into the work area;

(i)     keep all personnel out of the work area who are not trained and certified to work with ACM;

(j)     preclean all items taken into and out of the work area;

(k)     preclean all wall and floor surfaces that contain visible asbestos debris;

(l)     preclean all surfaces in the work area;

(m)     affix plastic sheeting to the walls before work begins;

(n)     install HEPA-filtered air filtration equipment that will continually filter air within the work area;

(o)     daily test air quality and record the results;

(p)     provide and maintain a decontamination facility between the work area and the rest of the Fenton Store;

(q)     create and maintain a clean room for use by workers on the Flooring Work;

11

(r)     wet all friable ACM and all ACM that becomes friable through the process of disturbing or removing it;

(s)     conduct air clearance monitoring throughout the Flooring Work;

(t)     ensure that once the Flooring Work is complete all surfaces are free of visible asbestos debris;

(u)     place all asbestos containing waste in leak-tight containers and label such containers with asbestos caution labels;

(v)     dispose of all asbestos containing waste at an authorized waste disposal facility; and

(w)     otherwise ensure compliance with Missouri Code of State Regulations 10 CSR 10-6.250, MO. REV. STAT. §§ 643.225-643.250, and 40 CFR 61 Subpart M.

55.     FrontStreet and its Representatives did not comply with any of the foregoing obligations under the Asbestos Ordinance.

56.     Ignorance of the condition of the Fenton Store or the nature of the tile and/or mastic involved in the Flooring Work is not a defense to FrontStreet's violation of the Asbestos Ordinance.

57.     In addition to violating Missouri statutes and the Asbestos Ordinance, FrontStreet and its Representatives also violated Missouri regulation 10 CSR 10.6-080, which adopted the federal regulatory standards for asbestos inspection and removal as set forth at 40 CFR 61, Subpart M.

58.     FrontStreet and its Representatives violated the Missouri regulation 10 CSR 10.6-080 and the federal standards, as set forth at 40 CFR 61, Subpart M, in multiple ways.

12

59.     Federal asbestos regulations (the "Asbestos Regulations") are codified at 40 CFR 61.140, *et seq.*  Under the Asbestos Regulations, FrontStreet is subject to and has liability for violating the Asbestos Regulations if it performed, controlled or supervised the Flooring Work done at the Fenton Store.  *See* 40 CFR 61.141.

60.     As FrontStreet contracted to remove more than 160 square feet of flooring as part of the Flooring Work, FrontStreet was required by the Asbestos Regulations to provide 10 days written notice to the Missouri Department of Natural Resources of FrontStreet's intent to undertake the Flooring Work before beginning the Flooring Work.  In the notice, FrontStreet was required to: (a) identify the location of the Flooring Work; (b) describe the nature and extent of the Flooring Work; (c) identify, quantify and estimate the extent of any ACM that would be disturbed during the Flooring Work; (d) describe the work practices and techniques that FrontStreet and/or its Subcontractor would use to comply with the Asbestos Regulations; (e) certify that at least one worker on the Flooring Work was trained and certified to work with ACM; and (f) identify the location where any ACM containing waste would be disposed.

61.     FrontStreet failed to comply with the notice requirements necessary for the removal of ACM, as set forth in the Asbestos Regulations.

62.     Under the Asbestos Regulations, FrontStreet also was required to: (a) adequately wet all ACM that became friable as work progressed; (b) implement emission controls in the Flooring Work area; (c) seal all ACM in leak-tight containers; (d) label all ACM containers with appropriate warning labels; and (e) dispose of all ACM containing waste at an EPA approved waste disposal facility.

63.     FrontStreet failed to comply with the method and performance requirements, as set forth in the Asbestos Regulations.

64.     In contradiction to its proposal and the Work Orders, FrontStreet failed to perform the Flooring Work at night, which timing exacerbated the problems caused by the release of the ACM.

65.     Because FrontStreet failed to comply with the method and performance requirements, as set forth in the Asbestos Regulations, including, but not limited to, failing to comply with the prework requirements and failing to properly isolate the work area and minimize the creation of ACM, the stock and inventory within the Fenton Store was exposed to substantial amounts of dust, some of which contained friable ACM.

66.     As dust, some of which contained friable ACM, was disbursed throughout the Fenton Store, in addition to the stock and inventory, various mechanical and other building components were exposed to the ACM, that may have otherwise been protected or powered down had the Flooring Work been performed in accordance with the method and performance requirements, as set forth in the Asbestos Regulations, and as expressly required by the Agreement.

67.     FrontStreet did not perform the Flooring Work in accordance with the Work Order, the applicable laws and regulations, and/or the Agreement.

68.     As a result of FrontStreet's failures, St. Louis County officials determined the Flooring Work potentially spread friable ACM dust throughout the Fenton Store, forced Advance to close the Fenton Store for several months, and imposed stringent remedial measures on Advance.

69.     The Fenton Store was closed for business beginning on or about the afternoon of March 22, 2016.

25661/1/8255551v1

70.     Advance had to engage the services of several testing, monitoring, extraction, abatement, and construction companies to undo the effects of FrontStreet's failures.

71.     Advance was required to replace several mechanical and building components as a result of the contamination caused by the ACM.

72.     Almost the entire stock and inventory within the Fenton Store was lost due to the potential ACM dust contamination caused by the Flooring Work, and the mandates of St. Louis County "Health Agreement."

73.     The Fenton Store re-opened for business on or about July 21, 2016.

**D.     Financial Consequences for Advance.**

74.     As a direct result of FrontStreet's failures to perform the Flooring Work correctly and pursuant to the Agreement, Advance has incurred significant financial damages.

75.     After the Flooring Work was in progress for several days, it was determined that certain mastic beneath the tiles that the Subcontractor removed was ACM.  Put another way, the tiles being removed were once bonded to the concrete floor with ACM mastic. Once this was determined, the Flooring Work was halted by St. Louis County Health Department and the Fenton Store was closed.

76.     The Fenton Store was closed during the time period noted above.

77.     Advance had to destroy or abandon stock and inventory ("Inventory Loss Costs"). Accordingly, Advance has incurred $313,453.47 in Inventory Loss Costs, which includes a credit of $17,217.60 for the limited salvage value of a small portion of the destroyed or abandoned stock and inventory.

25661/1/8255551v1

78.     Advance lost revenue during the period in which the Fenton Store remained closed ("Revenue Loss Costs").  Accordingly, Advance has incurred $443,141.00 in Revenue Loss Costs.

79.     Advance has incurred expenses to hire consultants, experts, and contractors to advise on addressing the proper handling and completion of the Flooring Work and to perform remedial measures to address the ACM throughout the Fenton Store ("Remediation Costs").  Accordingly, Advance has incurred $368,919.04 in Remediation Costs.

80.     Advance has incurred expenses for the replacement of furnishings, fixtures, and equipment ("FFE Replacement Costs").  Accordingly, Advance has incurred $70,190.02 in FFE Replacement Costs.

81.     Advance has incurred expenses related to the replacement of uniforms and travel costs for its employees ("Employee Expenses"). Accordingly, Advance has incurred $11,040.32 in Employee Expenses.

82.     Advance has also incurred and is continuing to incur attorney and legal expenses to respond to and address FrontStreet's mishandling of the Flooring Work ("Legal Costs").  Accordingly, Advance has incurred, as of the October 31, 2017, $36,757.72 in Legal Costs.

83.     Advance has notified FrontStreet in writing on multiple occasions that Advance holds FrontStreet responsible for this and for all damages.

84.     By letter dated March 25, 2016, Advance provided notice to FrontStreet under the Agreement and sought indemnity for the consequences of FrontStreet's breach of the Agreement and mishandling of the Flooring Work.

85.     FrontStreet has denied responsibility and refused to remedy its breaches.

16

86.     FrontStreet has refused to take responsibility and has even sought to be paid for work involved in the aftermath of the ACM release.

87.     After the events giving rise to this Complaint, Advance learned that FrontStreet and its Representatives did not have the necessary insurance required under the Agreement at the time FrontStreet attempted to perform the Flooring Work, and cuased the release of the ACM.

## COUNT I: BREACH OF CONTRACT

88.     Advance hereby adopts and incorporates the foregoing paragraphs of this Complaint as if set forth fully herein.

89.     The Agreement is a binding and legally enforceable contract between Advance and FrontStreet.

90.     FrontStreet undertook the Flooring Work pursuant to the scope of work of the Work Order and the Agreement.

91.     FrontStreet breached the Work Order and Agreement by:

(a)     failing to comply with all federal, state and local laws, ordinances, regulations and permits applicable to the Flooring Work, including all pertinent environmental laws and regulations;

(b)     failing to indemnify and hold Advance harmless from any loss, claim, damage, liability or expense, of any nature or kind (including attorneys' fees) directly or indirectly arising out of, related to or resulting from the Agreement, including FrontStreet's breach or default of any of the terms, conditions or obligations of the Agreement and any damage or injury of any kind, whether to person or property resulting from or arising out of FrontStreet's or the Subcontractor's performance or non-performance of the Flooring Work;

17

(c)    failing to maintain insurance during the term of the Agreement that included environmental liability and pollution clean-up coverage in the amount of $1,000,000 and that named Advance as an additional insured party;

(d)    failing to ensure that the Subcontractor maintained insurance with coverages and amounts equal to or better than the coverages and amounts set forth in the Agreement;

(e)    breaching its representations and warranties to Advance that FrontStreet and the Subcontractor would employ skilled, trained and, if required, licensed personnel for the performance of the services under the Agreement and all work would be completed in a good, professional and workmanlike manner, and to the standards and requirements of the industry;

(f)    breaching its representations and warranties to Advance that FrontStreet and the Subcontractor would perform the services under the Agreement in accordance with, and shall not violate any, applicable laws or regulations of any applicable jurisdiction;

(g)    failing to hire a Subcontractor that was a highly skilled professional with a good reputation and holding the Subcontractor to the same performance standards as FrontStreet;

(h)    failing to ensure that its subcontract with the Subcontractor contained equivalent contract terms to that of the Agreement; and

(i)    failing to actively monitor and manage the Subcontractor.

92.    Advance has performed all of its obligations under the Agreement.

25661/1/8255551v1

93.     Any obligation that FrontStreet claims was owed by Advance was waived or excused by FrontStreet's prior material breach of the Agreement.

94.     As a direct and proximate result of FrontStreet's breaches of the Agreement, Advance has been damaged to date in the amount of at least $1,243,501.57.  Damages in the form of attorney's fees and other court costs continue to accrue.

WHEREFORE, having stated a claim for breach of contract in this Count I of the Complaint against Defendant FrontStreet Facility Solutions, Inc., Plaintiff Advance Stores Company, Incorporated prays for judgment in its favor and against FrontStreet Facility Solutions, Inc. in an amount of at least $1,243,501.57, such final and total amount to be proven at trial, plus Advance's accruing attorneys' fees and costs, plus such other and further relief as the Court deems just and proper.

## COUNT II: INDEMNIFICATION

95.     Advance hereby adopts and incorporates the foregoing paragraphs of this Complaint as if set forth fully herein.

96.     The Agreement is a binding and legally enforceable contract between Advance and FrontStreet.

97.     Pursuant to the Agreement, FrontStreet agreed to:

> indemnify and hold Advance [ . . . ] harmless from any loss, claim, damage, liability or expense, of any nature or kind (including attorneys' fees) directly or indirectly arising out of, related to or resulting from this Agreement [ . . . ] including, without limitation any of the following: (i) *any breach* or default of any *of the terms, conditions, warranties, representations or obligations of Contractor contained herein*; (ii) *any damage or injury of any kind*, whether to person or property (including death), resulting from or arising out of the performance or non-performance of the Services by Contractor or its Representatives, its agents or employees[.]

*See* Exh. 1, § 9.2 (emphases added).

19

98.     FrontStreet has denied responsibility and refused to indemnify Advance.

99.     FrontStreet is contractually obligated to indemnify Advance for any damages that result from a breach of the Agreement, to the extent that Advance proves the existence of damages that are the responsibility of FrontStreet.

100.     As set forth in more detail above, Advance has incurred at least $1,243,501.57 in various financial damages as a result of FrontStreet's breach(es) of the Agreement, and continues to accrue damages.

101.     FrontStreet is liable to indemnify Advance pursuant to the Agreement for all of these damages.

WHEREFORE, having stated a claim for indemnification in this Count II of the Complaint against Defendant FrontStreet Facility Solutions, Inc., Plaintiff Advance Stores Company, Incorporated prays for judgment in its favor and against FrontStreet Facility Solutions, Inc. in an amount of at least $1,243,501.57, such final and total amount to be proven at trial, plus Advance's accruing attorneys' fees and costs, plus such other and further relief as the Court deems just and proper.

Pursuant to the Agreement, the Plaintiff DEMANDS A BENCH TRIAL.

ADVANCE STORES COMPANY,
INCORPORATED


By:_____/s/ K. Brett Marston_____
                    Of Counsel

K. Brett Marston (VSB No. 35900)
Andrew O. Gay (VSB No. 87553)
Alicha M. Grubb (VSB No. 90761)
GENTRY LOCKE
10 Franklin Road, SE, Suite 900
Roanoke, Virginia 24011
(540) 983-9300
Fax: (540) 983-9400

20

Marston@gentrylocke.com
gay@gentrylocke.com
grubb@gentrylocke.com
*Counsel for Advance*
*Advance Stores Company, Incorporated*

25661/1/8255551v1